UNITED STATES of America

v.

Benjamin J. THOMPSON, Appellant.

No. 71–1182.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 6, 1971.

Decided Oct. 7, 1971.

Petition for Rehearing Denied
Dec. 13, 1971.
Certiorari Denied March 20, 1972.
See 92 S.Ct. 1251.

Mr. Allen M. Hutter, Washington, D. C. (appointed by this court), for appellant.

Mr. Stephen W. Grafman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the pleadings, for appellee. Messrs. Earl J. Silbert and Herbert B. Hoffman, Asst. U. S. Attys., were also on the supplemental memoranda for appellee.

Mrs. Barbara Bowman, Washington, D. C., and Mr. Michael S. Wald, Ventura, Cal., filed a memorandum on behalf of the Public Defender Service as amicus curiae.

Mr. Bruce D. Beaudin, Washington, D. C., filed a memorandum on behalf of the District of Columbia Bail Agency as amicus curiae.

Before WRIGHT, LEVENTHAL* and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case comes to us on a motion for bail pending appeal following appellant's conviction in the District Court of violation of federal narcotics laws.[1] It presents important questions concerning the extent to which Congress can treat residents of the District of Columbia differently from residents of the 50 states and the extent to which Congress has attempted to do so in the District of Columbia Court Reform and Criminal Procedure Act of 1970 (hereinafter "Court Reform Act").[2]

In accordance with the Federal Rules of Appellate Procedure,[3] appellant first applied for bail in the District Court. The District Judge found that appellant did not meet the stringent requirements for post-conviction release set out in the Court Reform Act[4] and accordingly denied the application. Appellant now renews his motion in this court, contending that the trial judge erred in not applying the more lenient standards set out in the Bail Reform Act of 1966 (hereinafter "Bail Reform Act").[5] Appellant argues that the bail

---

* Judge Leventhal did not participate in this decision.

1. Appellant was found to have violated 21 U.S.C. § 174 (1964) which prohibits receipt and concealment of narcotic drugs, "knowing the same to have been imported * * * contrary to law," and 26 U.S.C. § 4704(a) (1964) which prohibits possession of narcotic drugs not in the original stamped package. He was sentenced to concurrent terms of five and one-to-five years imprisonment.

2. Pub.L. No. 91–358, 84 Stat. 473–668 (1970).

3. Rule 9(b), Fed.R.App.P., provides: "Application for release after a judgment of conviction shall be made in the first instance in the district court. * * *"

4. 84 Stat. 648 (1970), 23 D.C.Code § 1325 (c) (Supp. IV 1971):
"A person who has been convicted of an offense and sentenced to a term of confinement or imprisonment and has filed an appeal or a petition for a writ of certiorari shall be detained unless the judicial officer finds by clear and convincing evidence that (1) the person is not likely to flee or pose a danger to any other person or to the property of others, and (2) the appeal or petition for a writ of certiorari raises a substantial question of law or fact likely to result in a reversal or an order for new trial. * * *"

5. 18 U.S.C. § 3148 (Supp. V 1965–1969):
"A person * * * who has been convicted of an offense and is either awaiting sentence or has filed an appeal or a petition for a writ of certiorari, shall be treated in accordance with the provisions of section 3146 unless the court or judge has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community. If such a risk of flight or danger is believed to exist, or if it appears that an appeal is frivolous or taken for delay, the person may be ordered detained. * * *"
In appellant's initial motion and the Government's initial opposition in this court, the parties simply relied upon the different statutes without explanation. The court therefore requested supplemental memoranda from both parties "on the question of which Act applies in this case, and on possible legal objections to differential treatment of individuals con-

provisions of the Court Reform Act were intended to apply only to "local" offenses, and that the Bail Reform Act continues to govern bail determination in cases such as this where the defendant is convicted under federal criminal statutes having nationwide application. Alternatively, appellant contends that, if Congress did intend the Court Reform Act to apply to national offenses committed in the District of Columbia, that Act, as applied to him, violates his right to equal protection guaranteed in the due process clause of the Fifth Amendment.[6] For the reasons stated below, we hold that the District Judge erred in judging appellant's bail application under the Court Reform Act, and we remand for a determination of whether appellant qualifies for release under the Bail Reform Act.[7]

## I

Viewed in the abstract, this case poses a difficult issue of statutory construction as to the application of the bail provisions of the Court Reform Act to national crimes. The Court Reform Act nowhere makes clear whether it is intended to apply to all crimes commit-

victed of violating the same general federal statute." After oral argument, the court requested further memoranda from the parties and from *amici curiae* on the legislative history of the bail provisions of the 1970 Court Reform Act.

6. Since we dispose of this case on equal protection and statutory construction grounds, it is unnecessary to reach appellant's third contention that the Court Reform Act, as applied to him, constitutes an *ex post facto* law in violation of Article I § 9 of the Constitution.

7. Although it is not directly relevant to our disposition of the case, it is nonetheless important to note that a remand for further findings is necessary regardless of which act applies. The District Judge's order denying bail does no more than repeat the statutory standard contained in the Court Reform Act and state that the defendant has failed to meet it. Yet Rule 9(b), Fed.R.App.P., clearly states: "If the district court refuses release pending appeal, * * * the court shall state in writing the reasons for the action taken." A mere parrotting of the provisions of the applicable statute is not an adequate substitute for a full statement of reasons. *See* 9 J. W. Moore, Federal Practice ¶ 209.06 (1970). Nor is this requirement a mere procedural technicality. As this court stated in *Weaver v. United States*, 131 U.S.App. D.C. 388, 389, 405 F.2d 353, 354 (1968): "The District Judge should indicate not only which one or more of [the] reasons has prompted him to deny release, but should also delineate the basis for his utilization of such reason or reasons. * * * Only when these reasons are spelled out can an appellant intelligently renew his motion before this court; and only then can this court fairly review

the merits." *See also* United States v. Williams, 7 Cir., 253 F.2d 144 (1958); Rhodes v. United States, 4 Cir., 275 F.2d 78, 82 (1960); Jones v. United States, 123 U.S.App.D.C. 176, 177, 358 F.2d 543, 544 (1966); United States v. Seegers, 139 U.S.App.D.C. 335, 338, 433 F.2d 493, 496 (1970).

It is true that in *Weaver* the court was considering a bail application brought under the Bail Reform Act, whereas here the District Judge utilized the Court Reform Act. But even if we were to decide that the District Judge was correct in applying the Court Reform Act—and we in fact reject that contention—there is nothing in the Court Reform Act which purports to modify the requirements of Rule 9(b). While the Court Reform Act places a greater burden on the defendant seeking release, the provisions governing appeal from bail determinations are substantially identical with those contained in the Bail Reform Act. *Compare* 23 D.C.Code § 1324(b) (Supp. IV 1971) *and* 23 D.C.Code § 1325(d) (Supp. IV 1971) *with* 18 U.S.C. § 3147(b) (Supp. V 1965–1969).

Obviously, if a defendant produces no evidence supporting his request for bail, the trial judge can deny the application for the sole reason that the defendant has failed to satisfy the production burden which the Court Reform Act clearly places upon him. But where, as here, the defendant does come forward with evidence, Rule 9(b) requires a written statement from the judge specifying why he does not find that evidence "clear and convincing." The right to an effective appeal includes the right to know what one is appealing from. There is no reason why the parties, or for that matter this court, should be forced to operate in the dark when Rule 9(b) clearly provides otherwise.

ted in the District or merely to local offenses, and the legislative history is ambiguous at best. However, the first and most important rule for statutory construction is that laws should not be read in the abstract. Instead, courts approach the task of divining legislative intent with a set of presumptions which, while not irrebuttable, provide at least initial guidance. The first of these presumptions is that legislation duly enacted by Congress is constitutional. A corollary to this basic presumption is the principle that, when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a "clear statement" of a contrary legislative intent. When a statute is fairly subject to a variety of interpretations all but one of which would make it unconstitutional, then the courts must presume Congress intended the interpretation which is constitutionally permissible. *See, e. g.,* United States v. Rumely, 345 U.S. 41, 45, 73 S. Ct. 543, 97 L.Ed. 770 (1953); Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970). Thus if appellee's interpretation of the Court Reform Act would produce an unconstitutional result, there is at least a strong *prima facie* argument that the interpretation is erroneous.

In order to understand the force of appellant's constitutional objection to the construction of the Court Reform Act adopted by the trial judge, it is necessary to review briefly the background of that legislation. Before 1966, there was apparently no local statutory law governing the standards for bail determinations in the District of Columbia.[8]

In that year, however, Congress passed the Bail Reform Act which provided a complete set of guidelines for pre- and post-conviction bail determinations in all federal courts. Although the Bail Reform Act appeared on its face to govern all bail determinations in the District, Congress made certain of this result in passing the District of Columbia Bail Agency Act,[9] in the same year. Section 10 of the Bail Agency Act stated explicitly that the Bail Reform Act "shall apply to any person detained pursuant to law or charged with an offense in the District of Columbia."[10] Thus until 1970 when Congress enacted the Court Reform Act, it was clear that the Bail Reform Act governed all bail determinations for both national and local crimes committed in the District. The 1970 legislation repealed Section 10 of the Bail Agency Act.[11] It also instituted a system of pretrial detention for "violent" and "dangerous" defendants[12] as well as the stringent standards for post-conviction release which "shall apply in the District of Columbia in lieu of the provisions of [the Bail Reform Act]."[13]

Appellant does not, of course, quarrel with the application of the Court Reform Act bail provisions to purely local offenses in the District of Columbia. He points out, however, that the Court Reform Act does not purport to replace the Bail Reform Act as it operates in all federal courts. Therefore, if the Court Reform Act were held to govern bail determinations for national or Title 18, United States Code offenses committed in the District, it would create a special exception to the Bail Reform Act based only on the situs of the crime. If appel-

---

8. The only provision in the D.C.Code governing bail was 23 D.C.Code § 106 (1967): "Whenever a person charged with crime is held to bail the court shall have power to allow a deposit with the clerk of such court of money in the amount of the bail instead of requiring a bond or recognizance, and in case of default to declare such deposit forfeited to the United States or the District of Columbia as the case may be."

9. Pub.L. 89–519 § 10, 80 Stat. 329 (1966), 23 D.C.Code § 909 (1967).

10. *Ibid.*

11. *See* Pub.L. 91–358 § 210(b) (11), 84 Stat. 654.

12. *See* 23 D.C.Code § 1322 (Supp. IV 1971).

13. *See* 23 D.C.Code § 1332 (Supp. IV 1971).

lant committed the same offense in Maryland and was tried under the same federal statute, his request for bail would be judged under the Bail Reform Act. Yet because the crime was committed across the District boundary, that same request is governed by the harsher Court Reform Act. Such discrimination, appellant argues, is "so unjustifiable as to be violative of due process." *See* Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Shapiro v. Thompson, 394 U.S. 618, 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). In response, the Government points out that Congress has "complete legislative control over the District of Columbia, for every purpose of government, national as well as local," and that the situation in the District is *sui generis* since "only in the Nation's capital does the federal government * * * prosecute the full range of common law street crimes of violence."

We do not quarrel with appellee's contention that Congress exercises full plenary power over District affairs, *see* Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 619, 9 L.Ed. 1181 (1838); O'Donoghue v. United States, 289 U.S. 516, 538–539, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), or that it can use this power to serve national as well as local ends, *see* Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 429, 5 L.Ed. 257 (1821); Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 434–435, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); Neild v. District of Columbia, 71 App. D.C. 306, 311, 110 F.2d 246, 251 (1940). But these propositions are largely irrelevant to the issue before us. Surely appellee does not mean to contend that because Congress has plenary power in the District it can therefore ignore the Constitution.

■■ Congress' power over the District, like all powers in our system of government, has constitutional limits, and it is the duty of the judiciary to in-

sure that those limits are respected. As President Nixon stated in recommending passage of the Court Reform Act, "The District is a Federal city, but it should not be a Federal colony." [14] If there was ever any doubt that the Constitution was fully applicable to District residents, the issue was conclusively settled 70 years ago when the Supreme Court held that "[t]he mere cession of the District of Columbia to the Federal government relinquished the authority of the States, but it did not take it out of the United States or from under the aegis of the Constitution. * * * Indeed, it would have been a fanciful construction to hold that territory which had been once a part of the United States ceased to be such by being ceded directly to the Federal government." [15] One of the rights which the Constitution guarantees District residents, in common with all residents of the United States, is the right not to be arbitrarily singled out for special treatment not accorded to others similarly situated. Thus it is no response to contend, as the Government apparently does, that Congress was exercising its "plenary powers" when it created such an irrational classification. *See* D. C. Federation of Civic Associations, Inc. v. Volpe, 140 U.S.App.D.C. 162, 165, 434 F.2d 436, 439 (1970); Hamilton National Bank of Washington v. District of Columbia, 85 U.S.App.D.C. 109, 115, 176 F.2d 624, 630 (1949).

■ This is not to argue that Congress lacks the power to pass local laws applicable only to the District, or that such laws may not be different from the laws governing the conduct of citizens in the surrounding states. Obviously, such a position would be untenable given the responsibility of Congress to provide a comprehensive body of legislation for District residents. There is nothing unconstitutional about tailoring local statutes to meet local needs. *See* United States v. Sharpnack, 355 U.S. 286, 294,

---

14. Reprinted in 116 Cong.Rec. S11591 (daily ed. July 16, 1970).

15. Downes v. Bidwell, 182 U.S. 244, 261, 21 S.Ct. 770, 777, 45 L.Ed. 1088 (1901).

78 S.Ct. 291, 2 L.Ed.2d 282 (1958). But when Congress decides to enact national legislation, the situation is fundamentally different. The passage of such a law implies a threshold decision to override regional differences in favor of a uniform standard that will govern the entire country. If one small isolated group is then excluded from the operational effect of the statute, the rationality of that exclusion is highly suspect. *See* D. C. Federation of Civic Associations, Inc. v. Volpe, *supra*.

█ It might still be argued that Congress intended the Court Reform Act to serve as an experiment, and that if it operated successfully in the District it would subsequently be enacted for all federal jurisdictions. *Compare* House Committee on the District of Columbia, Report on the District of Columbia Court Reform and Criminal Procedure Act of 1970, H.R.Rep.91–907, 91st Cong., 2d Sess., 82 (1970) (hereinafter "House Report"). But the mere fact that District residents lack congressional representation does not justify their use as human guinea pigs—particularly when basic human rights are involved. As Mr. Justice Jackson said almost 30 years ago: "There are limits to the extent to which a legislatively represented majority may conduct biological experiments at the expense of the dignity and personality and natural powers of a minority— even those who have been guilty of what the majority define as crimes." [16] Those words were written in the context of a state experiment in eugenics at the expense of convicted felons. But surely the same principles apply to experimentation with the basic legal rights of citizens. Whatever one thinks of the concept of states as "little laboratories," it is clear that experimentation to determine the truth of at least some propositions ended with adoption of the Bill of Rights.

Of course, if the Government can point to a valid reason why those who are charged with national crimes in the District should be treated more harshly than their counterparts in every other federal jurisdiction, then the requirements of equal protection will have been met. But to argue that the District is *sui generis* because "only in the Nation's capital does the federal government * * * prosecute the full range of common law street crimes of violence" is to miss the point. It is clearly within congressional power to enact special rules for the District to deal with street crimes which it prosecutes nowhere else.[17] But the Government would have us believe that there is justification for special rules in the District for crimes prosecuted in every federal jurisdiction. That proposition is an entirely different matter, and its truth is hardly self-evident.

Thus we are hard pressed to see even a rational relationship between the classification created by this statute and any legitimate governmental policy. It is possible, of course, that there is something unique about the District which would justify special treatment for those convicted of crimes within its borders. It might be that there is a dramatically higher incidence of bail-jumping or of crimes committed while on bail among those convicted of federal offenses here, although the Government offers no statistics demonstrating that this is in fact the case. It is also conceivable that there is some as yet unelucidated interrelationship between the prosecution of local and national offenses making uniform bail determinations for all defendants in the jurisdiction desirable. But it is unnecessary for us seriously to consider such undocumented hypotheses, since the usual presumptions in favor of legislative classifications simply do not apply in this case.

---

16. Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 546, 62 S.Ct. 1110, 1116, 86 L.Ed. 1655 (1942) (Mr. Justice Jackson, concurring).

17. This is not to say that we find the bail provisions of this particular act as applied to local residents constitutional. That is an issue not raised in this case and we do not decide it.

■ We live in a representative democracy, and for that reason most policy issues, most of the time, are left to the elective branches of government. Hence if the legislature can point to a rational basis for a classification, the courts will not ordinarily overturn it. *See, e. g.*, Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911); United States v. Carolene Products Co., 304 U.S. 144, 58 S. Ct. 778, 82 L.Ed. 1234 (1938); Morey v. Doud, 354 U.S. 457, 463–464, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). Courts are particularly reluctant to intervene if the classification is "[i]n the area of economics [or] social welfare." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). But where fundamental personal liberties are involved, the political process may not operate quickly enough or effectively enough to prevent victimization of a helpless minority. *See* Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). *Compare* United States v. Carolene Products Co., *supra*, 304 U.S. at 152–153 n. 4, 58 S.Ct. 778. Therefore, in a certain limited class of cases the courts have subjected legislative classifications to much more exacting scrutiny and required a higher burden of proof before an apparently invidious discrimination is allowed to stand. Where a classification impinges on constitutional rights, the court's duty is clear, and such a classification is not permitted unless the legislature succeeds in demonstrating a "compelling interest." Shapiro v. Thompson, *supra*, 394 U.S. at 634, 89 S.Ct. 1322.

■ Although the right asserted is not explicitly mentioned in the Constitution, the courts will still "closely scrutinize" a classification limiting its exercise so long as fundamental personal freedoms are at stake. *See, e. g.*, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Reynolds v. Sims, 377 U.S. 533, 561–562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Harper v. Virginia Board of Elections, 383 U.S. 663, 670, 86 S.Ct.

1079, 16 L.Ed.2d 169 (1966). The courts have been particularly careful to inspect classifications relating to the criminal process, even in cases where it could not possibly be contended that constitutional rights are involved. *See* Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L. Ed.2d 586 (1970). The rights of a criminal defendant are in some sense the most basic of all, since what is at stake is no less than the freedom to be free.

■ Appellant does not argue that he has a constitutional right to bail pending appeal. *See* Bowman v. United States, 85 S.Ct. 232, 13 L.Ed.2d 171 (1964) (Mr. Justice Douglas, sitting as Circuit Justice); United States ex rel. Smith v. Prasse, E.D.Pa., 277 F.Supp. 391, 392 (1967); United States ex rel. Fink v. Heyd, E.D.La., 287 F.Supp. 716, 717 (1968). But the right to bail is "fundamental" in that it involves issues of personal freedom in the most immediate and literal sense of those words. *Compare* Stack v. Boyle, 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951). The harm done to an innocent defendant who "serves time" before his conviction is reversed on appeal cannot be undone and serves as a continuing affront to our sense of justice. There may well be times when the state is justified nonetheless in denying bail pending appeal. But when different standards are applied to bail applications based upon an apparently arbitrary classification, the courts are not obliged to accept hypothetical or unfounded excuses for the distinction drawn.

Moreover, there is a still more significant observation to be made about this case. What is involved here is not just any arbitrary classification between two similarly situated groups. The residents of Washington occupy a profoundly anomalous position in the federal system, and any classification which discriminates against them is particularly suspect. Writing for the Court in Reynolds

v. Sims, *supra*, Chief Justice Warren observed: "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."[18] But for residents of the District, the right to vote in congressional elections is not merely restricted—it is totally denied. This regrettable situation is a product of historical and legal forces over which this court has no control. *See* J. S. Young, The Washington Community 1800–1828 at 14–15 (1966). Until it is changed, however, the standard of review in equal protection cases involving the District may well be fundamentally affected. *See* D. C. Federation of Civic Associations, Inc. v. Volpe, *supra*.

▪ Although the courts have a vital role to play in preserving our constitutional rights, we normally depend upon the vote as "preservative of other basic civil and political rights."[19] Minorities can usually protect themselves by playing their role in the political process and forming coalitions with other groups to secure a majority. But it is senseless to remit District residents to the political process, since for them there *is* no political process.[20] The principle of majority rule loses its legitimacy when not all the votes are counted. *See* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1124–1126 & n. 275 (1969). In this context, at least, the normal arguments for judicial restraint become no more than hollow shibboleths grotesquely detached from the logic which once supported them.

There is no reason to pay deference to the views of a representative body which does not in fact represent those against whom it is discriminating. Therefore, discriminatory classifications affecting District residents must be subjected to the strictest possible review. *See* Hobson v. Hansen, D.D.C. 269 F.Supp. 401, 508 & n.198 (1967), *affirmed sub nom.* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969) (*en banc*). It is not enough for such classifications to be merely rational or even plausible; the justification offered must actually be *convincing*. Otherwise, the danger of "experimentation" with the rights of the voiceless residents of the District is too great to be tolerated. Since we are far from convinced that the classification urged by the Government serves any legitimate policy objective, we reject it as violative of equal protection.[21]

II

▪ Our finding that the Government's interpretation of the Court Reform Act would make the law unconstitutional creates a strong presumption that that interpretation is erroneous.[22] Of course, if the words of the statute or its legislative history made it undisputably clear that Congress intended a result which is unconstitutional, we would have to exercise our responsibility to invalidate the law. *Compare* King v. Smith, 392 U.S. 309, 334–335, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (Mr. Justice Douglas, concurring). But, in fact, the words of this statute are ambiguous and the legislative history extraordinarily murky. Hence, with the aid of the con-

18. 377 U.S. at 555, 84 S.Ct. at 1378.

19. *Id.* at 562, 84 S.Ct. at 1381.

20. Nor is the fact that over 70% of District residents are black wholly irrelevant to our disposition of this case. Blacks are the one minority group which has been most consistently frozen out of the political process, even in jurisdictions where their formal right to vote has not been infringed.

21. To the extent that anything in Sims v. Rives, 66 App.D.C. 24, 84 F.2d 871 (1936), is inconsistent with this opinion, that case is distinguished and limited to its facts. In *Sims* this court rejected petitioner's contention that the District of Columbia Indeterminate Sentences Act violated his right to equal protection when applied to national crimes, in part at least, because the petitioner failed to show that he would have received a shorter sentence under normal sentencing procedures. *See also* Sablowsky v. United States, 3 Cir., 101 F.2d 183, 188 (1938).

22. *See* text at p. 1337.

stitutionally rooted presumption, we have no difficulty concluding that Congress did not intend the irrational and invidious result urged by the Government.

The Government bases its interpretation of the Act almost entirely on a literal, formalistic reading of the statutory language. Appellee points out that Section 23–1325(c) of the Court Reform Act makes clear that the new post-conviction bail provisions are to apply to persons convicted of an "offense."[23] Section 23–1331(2) in turn defines "offense" as "any criminal offense committed in the District of Columbia, other than an offense triable by court-martial, military commission, provost court, or other military tribunal, which is in violation of an Act of Congress." It cannot be denied that if those words are read literally appellant falls within them. But sound statutory construction should never be an exercise in sterile, mechanical application of statutory language. When the words of a statute admit to no other meaning, then of course they must be followed. But most words are slippery, and if patently absurd results are to be avoided the words must be interpreted in light of the purpose intended. See e. g., Johnson v. Southern Pacific Co., 196 U.S. 1, 25 S.Ct. 158, 49 L.Ed. 363 (1904); United States v. Brown, 333 U.S. 18, 68 S.Ct. 376, 92 L. Ed. 442 (1948). A close look at this statute makes clear that the statutory definitions do not absolutely require an interpretation which would render it unconstitutional. For example, it is noteworthy that whereas the definition of "offense" refers to violation of *"an Act of Congress"* (emphasis added), the very next subsection speaks of definitions contained in *"any Act of Congress."*[24] Given this otherwise inexplicable differ-

ence in language, it is at least plausible to assume that the legislature intended "an Act of Congress" to mean only those acts of Congress having exclusively local application.

When one looks at the purposes of the statute as a whole, this initial suspicion hardens into near certainty. The Court Reform Act contains comprehensive provisions reorganizing the local court system and modifying local rules of procedure. The overriding purpose which emerges from the Act is to put the District's judicial system on a par with those of the states. Thus Congressman Harsha, arguing for passage of the bill on the House floor, stated that under it "[f]or the first time, the District of Columbia will enjoy its own unified judicial system—a system on a par with systems in the 50 States."[25] Similarly, the Act provides for participation of the District along with the states in the Interstate Compact on Juveniles,[26] and takes advantage of the authority granted in the Safe Streets Act of 1968 for states to enact local wiretapping laws.[27]

The interpretation of the bail provisions of the Act which is most consistent with this general desire to treat the District on a par with the states is that advocated by appellant. While the states may impose their own bail standards for local crimes tried in local courts, the Bail Reform Act controls when national crimes are tried in federal courts. If the District is to be treated like a state, then federal courts here should follow the national act when dealing with national crimes, reserving the act which is applicable only within the jurisdiction to bail determinations in cases involving local offenses tried in local courts. Indeed, there are strong indications that some congressmen had the

---

23. *See* Note 4, *supra.*

24. 23 D.C.Code § 1331(3) (Supp. IV 1971) (emphasis added).

25. 116 Cong.Rec. (Part 6) 8098 (1970). *See also* House Report at 35.

26. 32 D.C.Code §§ 1101–1106 (Supp. IV 1971).

27. 23 D.C.Code § 541–556 (Supp. IV 1971).

state analogy specifically in mind when they considered the bail provisions. Congressman Nelsen, for example, stated:

"* * * There are those who talk about pretrial detention as being something brand new, and which is way out of line. Let me call your attention to the fact that in the city of New York they have a money bail statute which does the same thing. * * *

* * * * * *

"* * * I think it is wrong for most of us in our own States to have a bail system that as a practical matter is used for pretrial detention and deny it to citizens of the District of Columbia. * * * "28

A related but distinct purpose of the Court Reform Act is to disentangle problems of "local" and "national" law as much as possible. *See* Cheek v. Washington, D.D.C., 333 F.Supp. 481, 484 n.4 (1971). Thus Senator Baker argued:

"This legislation establishes the first truly local court system in the District of Columbia's history. The peculiar mixture of both Federal and local business in the Federal courts is ended, and the Federal courts are freed to devote themselves entirely to Federal matters. * * * "29

*See also* House Report at 23; Senate Committee on the District of Columbia, Report to Accompany S. 2601, S.Rep. 91–405, 91st Cong., 2d Sess., 5 (1969) (hereinafter "Senate Report"). Yet if appellee's contentions are to be believed, the Court Reform Act not only fails to end the "peculiar mixture" of federal and local business in the federal courts —it actually compounds the problem.

The Government would have us construe the Act in such a way that the national courts would be administering a statute of local application in connection with prosecution of national crimes. Such a construction cannot be reconciled with the specific statement in the House Report that the bill would "terminate the anomaly in the District of Federal trial and appellate judges being required to devote their time and energy to matters of a purely local nature." 30

When one looks at the narrower purposes of the Act's bail provisions in particular, it becomes still more obvious that those provisions were not intended to apply to national offenses. Thus it is quite significant that most congressmen seem to have been almost entirely preoccupied with the type of violent "street crime" which is prosecuted under local statutes. The House District Committee, for example, complained: "The criminal is just not punished here, and he continues to roam the streets of Washington, increasing, month by month, his murders and his rapes, his robberies and aggravated assaults, his housebreaking, larceny and auto thefts, not to mention the less serious crimes committed by the thousand." 31 Later, the Committee observed: "[O]nly in the Nation's capital does the federal government, prosecute the full range of common law street crimes such as rape, robbery, and burglary * * *. The rise of such crime in the District since the enactment of the Bail Reform Act has been appalling." 32 Nor is it without importance that the four cases which the House District Committee wished to "overrule" by passage of the post-conviction bail provisions 33 all involved release of defendants convicted of local crimes.34

---

28. 116 Cong.Rec. (Part 6) at 8087–8089.

29. 116 Cong.Rec. S11604 (daily ed. July 16, 1970).

30. House Report at 23.

31. *Id.* at 15.

32. *Id.* at 89.

33. *Id.* at 186–187.

34. United States v. Harrison, 131 U.S. App.D.C. 390, 405 F.2d 355 (1968) (felony murder); Banks v. United States, 134 U.S.App.D.C. 254, 414 F.2d 1150 (1969) (robbery and assault with a deadly weapon); United States v. Forrest, 135 U.S.App.D.C. 350, 418 F.2d 1186 (1969) (carnal knowledge); United States v. Seegers, 139 U.S.App.D.C. 335, 433 F.2d 493 (1970) (burglary).

The Government responds to this purposive analysis with arguments based on a wooden, mechanical reading of the statutory language. Yet even if one examines the Government's arguments on their own terms and ignores the presumptions stemming from purposive and constitutional analysis, it is by no means obvious that those arguments compel the result contended for. For example, the Government argues that, since the "judicial officers" making bail determinations are defined to include "national" as well as "local" judges,[35] the bail provisions of the Act must have been intended to apply to national offenses. It is quite possible, however, that this definition was instead intended to allow national judges to apply the Act's bail provisions to local offenses during the transition period while some local crimes were still being tried in United States District Court.[36] Moreover, even after full local jurisdiction is transferred to the local courts, the United States District Court will still exercise jurisdiction over local crimes when the local offense is joined with an indictment for a national crime.[37]

The Government also points to 23 D. C.Code § 1331(3) (E) (Supp. IV 1971), which defines "dangerous crime" for purposes of pretrial detention to include "unlawful sale or distribution of a narcotic or depressant or stimulant drug (as defined by *any* Act of Congress) * * *." (Emphasis added.) Since this section clearly refers to both local and national legislation, the Government argues that the pretrial detention sections must have been intended to apply to national as well as local crimes. But the short answer to this argument is that even if it is correct it has only marginal relevance to the case before us.

If, in some future case, we find compelling reasons to construe the language of the pretrial detention sections to include national offenses, then we shall rule on the constitutionality of those provisions as so construed.[38] But such a finding can have little bearing on this case, since the Government can point to no compelling reason why the *post-conviction* bail provisions should be construed so as to make them unconstitutional.

Moreover, we note in passing that the Government's construction of 23 D.C. Code § 1331(3) (E) is by no means the only plausible one. The section does not refer to narcotic drugs made unlawful by any Act of Congress. Instead, it speaks of "unlawful sale or distribution" of narcotics, depressants and stimulants "as *defined* by any Act of Congress." (Emphasis added.) This language suggests to us that while the drug can be defined as a narcotic by national legislation, its possession must be made unlawful by local statutes before pretrial detention becomes applicable to it. The plausibility of such an interpretation is strengthened by similar language in the next subsection defining "crimes of violence." Such crimes include "an attempt or conspiracy to commit any of the foregoing offenses [listed earlier in the subsection] as defined by any Act of Congress *or any State law* * * *." (Emphasis added.) Clearly, Congress could not have intended to authorize pretrial detention for a defendant whose acts, while criminal in some other state, were legal in the District. Its intention, therefore, must have been to permit the *definition* of the offense to be contained in state or national law, while requiring the statute making that offense unlawful in the District to be a matter of local law.[39]

---

35. *See* 23 D.C.Code § 1302(1) (Supp. IV 1971).

36. *See* 11 D.C.Code § 502 (Supp. IV 1971).

37. *See* 11 D.C.Code § 502(3) (Supp. IV 1971).

38. *See* text at pp. 1336–1337.

39. *See* 22 D.C.Code § 105a(c) (Supp. IV 1971) making it a local offense under some circumstances to conspire within the District to conduct activity outside the District which would be criminal as defined by the statutes of the jurisdiction within which the activity was to be performed.

The Government makes a similar argument based on the jurisdictions of the District of Columbia Bail Agency and the District of Columbia Public Defender Service. Its position seems to be that if "District of Columbia" is read narrowly in one part of the statute it must be so read every time it is used. Therefore, it is argued, reading these words to mean that the bail provisions of the Act apply only to local offenses would mean reading the same words to restrict jurisdiction of the Bail Agency and the Public Defender to local courts—a result which Congress obviously did not intend.

We know of no canon of statutory construction which requires this kind of slavish formalism. The very fact that Congress obviously did not intend to restrict the jurisdiction of the Bail Agency and the Public Defender, whereas congressional intent concerning the post-conviction bail standards is far less clear, itself provides sufficient justification for interpreting the words "District of Columbia" differently in the different sections. Words are meant to be read in context, and as the context changes the meaning we give to them changes as well. As Mr. Justice Sutherland observed in Atlantic Cleaners & Dyers, Inc. v. United States, *supra*, 286 U.S. at 433, 52 S.Ct. at 609:

" * * * Most words have different shades of meaning, and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section. Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. * * * But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.
* * * "

Ultimately, then, the Government's entire case is made to rest on a single scrap of solid evidence. This consists of a one-sentence statement by Congressman McMillan strangely inserted in an exhaustive section-by-section analysis of the bill which was printed in the Congressional Record: "Section 23–1331(2) defines the term 'offense' to include offenses against the United States and violations of the District of Columbia Code as long as the offense is committed in the District of Columbia." [40] This statement is buried in the middle of voluminous legislative history on the bill. It is not found in either the House District Committee report or the Conference Committee report where the same section-by-section analysis appears, and there is absolutely no indication that other congressmen focused on it or, indeed, were even aware of its existence. Moreover, the statement must be measured against not only the constitutional and purposive analysis set out above, but also against a directly contrary statement which does appear in the House Report: "[Y]our Committee in this bill has attempted to treat with the entire range of problems besetting the courts, especially the criminal courts, and the handling and treatment of criminals in *local* courts. * * * Pretrial detention is * * * provided for in this bill so as to give needed reform to *local* bail procedures after what appears to be a devastating experience under the Bail Reform Act of 1966, imposed on the District of Columbia by Congress, for all local, common law, and statutory

40. 116 Cong.Rec. (Part 6) at 8211.

crimes." [41]  In light of all the other evidence, we simply refuse to believe that the House—much less the Senate—intended to enact Congressman McMillan's statement into law.  If we permitted one congressman to change the meaning of a statute by a single statement quietly inserted in the Congressional Record, we would make a mockery of the legislative process.

### III

Speaking on the House floor in opposition to the Court Reform Act, Congressman Gallagher warned: "Certain sections give credence to the often heard but thus far, at least, unprovable statement that the District of Columbia is the last plantation." [42]  The responsibility for keeping that statement unprovable rests in the first instance with Congress.  But it is also the responsibility of the judiciary to insure that statutory language is not used as a cover for depriving District residents of fundamental rights.  In the end, it makes little difference if such judicial intervention is labelled "statutory construction" or "constitutional review."  The important point is that discriminatory treatment of a powerless, voteless minority is antithetical to our constitutional heritage and that the courts act in the best tradition of American jurisprudence when they refuse to tolerate it.

It is with this tradition in mind that we remand the record in this case for determination of appellant's right to bail according to the standards set forth in the Bail Reform Act.

Remanded.

---

41. House Report at 87.  (Emphasis added.)  *See also* Senate Committee on the District of Columbia, Statement of the Managers on the Part of the Senate Submitted Regarding the Conference Action Upon S. 2601, the President's Crime Legislation for the District of Columbia, 91st

Cong., 2d Sess. (committee print), at 3 (1970):  "[T]his bill is the only local crime legislation Congress can enact for any particular jurisdiction in the Continental United States."

42. 116 Cong.Rec. (Part 6) at 8112.