**UNITED STATES of America**

**v.**

**Dennis T. McDONALD, Appellant.**

**No. 71–1085.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1972.

Decided June 21, 1973.

---

J. Roy Thompson, Jr., Washington, D. C. (appointed by this Court), for appellant.

Leonard W. Belter, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and David C. Woll, Asst. U. S. Attys., were on the brief for appellee. Harold H. Titus, Jr., U. S. Atty., also entered an appearance for appellee.

Marilyn Cohen and Robert M. Werdig, Jr., Washington, D. C., were on the brief as amicus curiae.

Before BAZELON, Chief Judge, WILKEY, Circuit Judge, and MATTHEWS,* Senior District Judge for the United States District Court for the District of Columbia.

WILKEY, Circuit Judge:

 On 13 November 1970 appellant was found guilty of robbery (22 D. C.Code § 2901), simple assault (22 D.C. Code § 502), and carrying a pistol without a license (22 D.C.Code § 3204). He was sentenced to 2–6 years for the robbery, 1 year for the assault, and 1 year for carrying the pistol, all sentences to run concurrently. At the time of his conviction, McDonald was twenty-two years old. The only contention meriting discussion on this appeal is his claim that the District Court improperly sentenced him as an adult offender.[1]

---

* Sitting by designation pursuant to 28 U.S. C. § 294(c).

1. Appellant also claims that the trial court abused its discretion by allowing the Government to impeach his testimony with a 1967 conviction for housebreaking. See Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965). Since this ruling followed argument by counsel, the court did give on-the-record consideration to McDonald's attempt to show sufficient reason for withholding the past conviction from the jury. The court's decision, implicitly finding that no sufficient showing was made, is buttressed by the fact that the case "had narrowed to the credibility of . . . the accused and his accuser— and in those circumstances there was greater, not less, compelling reason for exploring all avenues which would shed light on which of the two witnesses was to be believed." Gordon v. United States, 127 U.S.App.D.C. 343, 348, 383 F.2d 936, 941 (1967).

In addition, appellant claims that there was insufficient evidence to support the conviction for carrying a pistol without a license. He argues that 22 D.C. Code

Appellant contends that he was eligible for youth corrections treatment pursuant to the Young Adult Offender statute.[2] He claims that the District Court erred in either (1) failing to articulate reasons for deciding in favor of an adult sentence or (2) acting on the presumption that, where only D.C.Code offenses were charged, the Young Adult Offender statute did not apply to give a youth corrections option.

The District Court's reasons for imposing an adult sentence do not emerge clearly from the transcript. At times, the judge expressed a desire to insure that the defendant serve a minimum sentence in confinement.[3] In other instances, the judge expressed his feeling that the defendant would benefit from sentencing under the Youth Corrections Act, which is inconsistent with a minimum period of incarceration. There is some indication that the judge felt that defendant was ineligible for youth corrections treatment as a matter of law. Since the decision to sentence McDonald as an adult was proper regardless of which description of the District Court's actions and motives is accepted, the judgment must be affirmed.

■ If the judge thought he had an option to sentence McDonald under the Young Adult Offenders statute, the fact remains that he declined to do so. His failure to make specific findings or to articulate his reasons for this decision was not in error. Under the broad discretion granted by the Young Adult Offender statute, a court which found that an offender would benefit from Youth Corrections Act treatment would still not be required so to sentence him. Furthermore, no finding on potential benefit is required, because "an offender older than 22 years but less than 26 years is, as a general proposition, to be treated as an adult." United States v. Waters.[4]

■ If, on the other hand, the District Court concluded that the Young Adult Offenders statute did not apply because only D.C.Code violations were involved, this conclusion must be upheld

---

§ 3204 requires that the weapon be found "on or about his person"; whereas the searching officer found the pistol on the floorboard and between and behind the front bucket seats of the car in which appellant and his companion were riding— where "you couldn't just reach around and get it." Transcript, at p. 137. This court has construed "about" to mean "in such proximity to the person to be convenient of access and within reach." See Brown v. United States, 58 U.S.App.D.C. 311, 312, 30 F.2d 474, 475 (1929). The placement of this pistol made it even more accessible than the one under a hinged front seat, which could only be removed after leaving the car, in Wilson v. United States, 91 U.S.App.D.C. 135, 198 F.2d 299 (1952). As in *Wilson*, we find that the evidence was clearly sufficient to justify submitting the issue to the jury. See Crawford v. United States, 126 U.S.App. D.C. 156, 375 F.2d 332 (1967).

2. 18 U.S.C. § 4209 provides, in part:
In the case of a defendant who has attained his twenty-second birthday, but who has not attained his twenty-sixth birthday at the time of his conviction, if . . . the court finds that there is [sic] reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act . . . sentence may be imposed pursuant to the provisions of such act.

3. At sentencing, the Court said: "[a]t 22, and the robbery, I want a minimum." See Sentencing Transcript at pp. 6–7.

4. 141 U.S.App.D.C. 289, 437 F.2d 722, 723 (1970). The legislative history of the Young Adult Offenders statute makes it clear that youth corrections treatment is to be afforded to those between their 22nd and 26th birthdays only "in exceptional cases" and only "when the court makes a special finding." 437 F.2d 722, 723–724, n. 7. The analysis in the *Waters* case was confirmed by this court *en banc* in the recent cases of United States v. Coefield, 155 U.S.App.D.C. 205, 476 F.2d 1152 (decided 6 February 1973), United States v. Reed, 155 U.S.App.D.C. 198, 476 F.2d 1145 (decided 9 March 1973), and United States v. Hoston, 155 U.S.App. D.C. 198, 476 F.2d 1145 (decided 9 March 1973).

as correct. Section 6 of Public Law 85–752 provides:

> Sections 3 and 4 of this Act [the Young Adult Offenders statute] shall apply in the States of the United States, and in the District of Columbia *so far as they relate to persons charged with or convicted of offenses under any law of the United States not applicable exclusively to the District of Columbia.* [Emphasis added.]

Since the Young Adult Offenders statute applies solely to persons convicted of national crimes, and the defendant was charged with and convicted of purely D. C.Code offenses, this case comes squarely within that limiting statutory language.[5]

█ Appellant and amicus curiae claim that Section 6 unconstitutionally discriminates against those found to have violated local D.C. law. This argument essentially rests on one of two propositions: (1) the Young Adult Offenders statute improperly selects out District of Columbia offenders for separate treatment; or (2) there is no justifiable reason for Congress not to extend the special benefit of the national statute to *local* offenders. Neither contention is supported by logic or precedent.[6]

As to the first claim, amicus places strong reliance on dicta in United States v. Thompson.[7] That case did involve the important question of the "extent to which Congress can treat residents of the District of Columbia differently from residents of the 50 states . . . ."[8] The court there held that the more lenient federal Bail Reform Act covered a defendant charged under national federal criminal statutes and that the more stringent bail provision of

the District of Columbia Court Reform Act had to be construed as applying only to local D.C. offenses.

We would agree with appellant that excluding the District of Columbia from the *nationally* applicable provisions of the Young Adult Offenders statute might be suspect. But appellant's argument is completely confused: this has not been done; to the contrary, appellant is being treated exactly as he would be if he were a citizen of one of the 50 states. Appellant here is not a local resident convicted of a *national* offense claiming a right to uniform application of the statute. Rather, caught in a situation precisely the *opposite* of that in *Thompson*, McDonald is complaining that he *has not been separated out* for special treatment "based only on the situs of the crime."[9]

Appellant overlooks the fact that the special mention of the District of Columbia in the Young Adult Offenders statute was required solely by the "anomaly" that certain "laws of the United States" are not national in character. The "special" provision relating to "any law of the United States" . . . "applicable exclusively to the District of Columbia" does not create special treatment for D.C.Code offenders —it merely operates to place the District of Columbia in the same status as the other states. Under the clear words of the statute, citizens of the District are in the same situation as all others: a person convicted of violating a local law cannot claim the benefit of the Young Adult Offenders statutes, while a person convicted of violating a federal law *in any jurisdiction* can claim its coverage.

---

5. Another limiting provision, Section 7 of Public Law 85–752, provides that the Young Adult Offenders statute does not apply to any offense for which there is a mandatory penalty. Given our conclusions concerning Section 6, we need not consider whether the District of Columbia robbery statute fits within this definition.

6. At the outset, we reject the dissent's suggestion that we are in some way immuniz-

ing section 6 from constitutional scrutiny; rather, we scrutinize and find no flaw.

7. 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), cert. denied, 405 U.S. 998, 92 S. Ct. 1251, 31 L.Ed.2d 467 (1972).

8. 452 F.2d at p. 1335.

9. 452 F.2d at p. 1337.

As the *Thompson* court noted, the passage of a national law "implies a threshold decision to override regional differences in favor of a uniform standard that will govern the entire country."[10] Appellant's argument appears to rest on the proposition that the courts must insist on uniform application of national laws when this operates to provide more lenient treatment for offenders in D. C. —but that a statutory provision which mentions D. C. in order to bring it into conformity with the 50 states is invalidly discriminatory if the resulting uniformity operates to treat local offenders more harshly than would a desired special exception.[11] We find neither logic nor sound policy in that suggestion.

The second prong of appellant's constitutional argument concerns the statutory scheme's effect of distinguishing between two groups of offenders. Those persons under 22 years of age violating local D. C. law have a chance of receiving federal Youth Corrections Act treatment; while those between their 22nd and 26th birthdays, violating local law, do not. As amicus points out, Congress extended the Youth Corrections Act to local D.C.Code offenders. His accompanying argument is that a similar extension is *required* in the case of the Young Adult Offenders statute. That just does not follow.

Refusal to extend the Young Adult Offenders statute is a rational discrimination based on an age group, not one against D. C. offenders.[12] So the *Thompson* court's requirements regarding special treatment of the District of Columbia—"the strictest possible review" and a "convincing" justification—do not apply. Further, the fact that Congress can enact special local legislation dealing with the District of Columbia does not mean that it must always do so.

The Young Adult Offenders statute is a cautious extension of the Youth Corrections Act.[13] It is the sort of reform which Congress is allowed to take "one step at a time."[14] Congress has chosen a rational limit to the first step —applying the reform to national crimes and stopping short of applying it to the full range of common law street crimes, which are prosecuted by the Federal Government only in the District of Columbia.

There was nothing particularly novel about Congress' choice to give special "youth" treatment to offenders between the ages of 18 and 21, and then later to extend it to the District of Columbia. Although there was practically no discussion of this point,[15] extension of Youth Corrections Act treatment to local D. C. offenders in that age bracket

---

10. 452 F.2d at p. 1339.

11. Our dissenting colleague speaks repeatedly of the ways in which Congressional refusal to extend the Young Adult Offenders statute's coverage to local offenders harms or "disadvantages" the residents of D.C. It should be noted that if there is "disadvantage" to anyone it is to *those who violate the D.C. Code* and who are thereby accountable to the District of Columbia for their acts—not any disadvantage to *D.C. residents per se.* District residents have just as great an interest in seeing that less-than-youthful perpetrators of crimes of violence, characteristically covered by local law, are removed from society for a definite term of years as do the citizens of the 50 states, in which the Young Adult Offenders statute only extends to federal crimes, precisely as in D.C. See footnote 15, *infra.*

12. Even if, as we do not by any means concede, this refusal is a distinction based *solely* on the difference between a violation of the D.C.Code and federal law, a distinction based on precisely that criterion was approved in *Thompson* itself.

13. Congressman Celler, on whose characterization of the Act amicus relies, prefaced his remarks in the floor debates on the Act by noting:
 There is no general extension of the Youth Correction Act by this proposed legislation. 104 Cong. Rec. 13393 (1958).

14. See McDonald v. Board of Education, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L. Ed.2d 739 (1969).

15. When considering this expansion, the Congress focused entirely on the elimination of budgetary and procedural prob-

was not at variance with the practice in some states. In contrast, special youth treatment for those between the ages of 22 and 26 was indeed quite novel. We think it was an eminently valid approach to treat the District of Columbia like any other state in this context by refusing to extend the experiment to common law street crimes of the type covered by state law or the D.C.Code.[16]

In short, to hold Congress' action here unconstitutional would be tantamount to saying that Congress could not pass national legislation dealing only with the problems of national crimes without making that legislation applicable to local offenses committed in the District of Columbia. The statute challenged here is definitely not an experiment "with the rights of the voiceless residents of the District."[17] Rather, it constitutes a legislative judgment not to extend an experiment which concerns only those who commit federal offenses. Congress was as free to draw that line as it was to deny the benefit of the experiment to those offenders who had passed their 26th birthday. Acceptance of the contrary theory would nullify every enactment dealing with purely local D.C. offenses which is at variance with its national federal counterpart. We decline the invitation to so hold; accordingly, the judgment of the District Court is

Affirmed.

BAZELON, Chief Judge, concurring in part and dissenting in part:

I agree that McDonald's conviction must be affirmed. I also agree that the trial judge's statements at the sentencing hearing were problematic. But I cannot agree that the sentence was nonetheless properly imposed.

The majority begins by asserting that the Young Adult Offender statute does not require that the sentencing judge state his reasons when he denies an eligible offender such a sentence.[1] I cannot agree. Nor do I think that United States v. Waters,[2] where the sole statute

---

lems which had previously been thought to make the Act's application to the District problematical. See H.R. Rep. No. 1629, 82nd Cong., 2d Sess. as cited in 1952 U.S. Code Cong. & Admin. News, pp. 1379 et seq.

Congress failed to consider the potential impact on the policy of the Act of the differing sorts of offenses covered by the U.S. and D.C. Codes. The federal offenses habitually engaged in by youthful offenders, and for which youth corrections treatment was considered most desirable, were Dyer Act violations, i. e., the theft of automobiles. When the Youth Corrections Act was originally considered, Mr. James V. Bennett, Director of the United States Bureau of Prisons, testified that "far and away the largest number of young offenders who would come to us under the bill are automobile theft cases." Hearings on S. 2609 Before a Subcomm. of the Senate Comm. on the Judiciary, 81st Cong., 1st Sess., 29 (1949). In contrast, many of the crimes committed by young people in violation of a "law of the United States applicable exclusively to the District of Columbia" involve much more serious, violent or vicious conduct. See 119 Cong. Rec. 4553 et seq. (Daily ed. 14 Mar. 1973) (remarks of Senator Beall).

This extension of the Youth Corrections Act to local street crimes of violence potentially creates the precise effect which the Act was designed to avoid. Young perpetrators of the sort of violent street crimes which do not fall within the federal jurisdiction in the fifty states are made eligible for confinement along with those whose "federal offense" consisted of a "joy ride"—making youth corrections facilities more crowded and rendering rehabilitation all that much more difficult. Were Congress to focus on that fact, second thoughts about the expansion of the Youth Corrections Act to D.C. Code offenses would inevitably arise.

16. Appellant protests that some local offenses have very similar federal counterparts. That argument was considered of no moment in *Thompson*, despite the fact that one charged with robbery under D.C. law could incur harsher bail treatment than one charged with federal bank robbery.

17. United States v. Thompson, 147 U.S. App.D.C. 1, 452 F.2d 1333, 1341 (1971).

1. *See* Majority Opinion at 515. *Compare* United States v. Coefield, 155 U.S.App. D.C. 205, 476 F.2d 1152 (D.C.Cir. Feb. 6, 1973).

2. 141 U.S.App.D.C. 289, 437 F.2d 722 (1970).

at issue was the Youth Corrections Act, can be taken as having settled the question in its dicta.

But, more to the point, I do not think that this case involves the requirement that reasons be stated any more than did *Waters*. Under the majority's view of the present case, this issue is irrelevant, because they hold that McDonald was ineligible. Under my view, the requirement of reasons is not in issue because the trial judge did state reasons for his action. The problem in this case is that one of the stated reasons was the judge's belief that McDonald was ineligible.

I believe that this was error, and that the trial judge's reliance on this ground rendered the sentencing illegal.[3] I would therefore vacate the sentence imposed and remand for resentencing. At that time the trial judge could properly weigh the value of a sentence under the Young Adult Offender statute against the value of the other sentences available, including the "minimum" he mentioned during the original sentencing hearing.[4]

I

McDonald was twenty-one years old at the time of the robbery, but did not come to trial for eleven months. Five weeks before the jury returned its verdict, he turned twenty-two and thus became ineligible for sentencing directly under the Youth Corrections Act, 18 U.S.C. §§ 5005–26 (1970).[5] Both at sentencing and on this appeal, however, McDonald has contended that he was eligible for consideration for such a sentence by virtue of the Young Adult Offender statute, 18 U.S.C. § 4209 (1970), which provides:

> In the case of a defendant who has attained his twenty-second birthday but has not attained his twenty-sixth birthday at the time of conviction, if . . . the court finds that there is [sic] reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act sentence may be imposed pursuant to the provisions of such act.[6]

The trial judge instead imposed an adult sentence of two to six years imprisonment at an adult facility.[7] Although the

---

3. *See* Ingram v. United States, 122 U.S. App.D.C. 334, 353 F.2d 872 (1965).

4. The trial judge repeatedly expressed his desire to keep McDonald out of an adult prison. Intertwined with these comments, however were statements that he wished to give appellant a "minimum." Apparently he meant that he wanted to ensure that McDonald would serve at least a certain amount of his sentence in some type of confinement. This cannot be accomplished under the Young Adult Offender statute or the Youth Corrections Act. *See* United States v. Waters, 141 U.S.App.D.C. 289, 437 F.2d 722 (1970).

 The Government argues that this is a sufficient basis for affirmance. But the record fails to disclose whether the trial judge decided that *even if* the Young Adult Offender statute was available, he would insist on a "minimum" and thus choose to sentence McDonald as an adult. The sentencing decision in this case was one of choosing between a number of options. *See also* 16 D.C.Code § 710 (1967); 24 D.C.Code § 203 (1967).

5. A "youth offender" eligible for sentencing under 18 U.S.C. § 5010 (1970), is "a person under the age of twenty-two years at the time of conviction." 18 U.S.C. § 5006(e) (1970). "Conviction," in this context, means the verdict of guilty. *See* United States v. Carmichael, 152 U.S. App.D.C. 197, 469 F.2d 937 (1972); United States v. Carter, 225 F.Supp. 566 (D.D.C.1968).

6. The deleted language sets forth a non-exclusive list of factors to be considered in this determination:

 . . . after taking into account the previous record of the defendant as to delinquency or criminal experience, his social background, capabilities, mental and physical health, and such other factors as may be considered pertinent

 . . .

 18 U.S.C. § 4209 (1970). *See* text accompanying notes 73–74 *infra*.

7. *See* United States v. Spinner & McDonald, Cr.No. 461–70 (D.D.C. November 13, 1970). Spinner, the codefendant, was convicted of armed robbery, assault with

judge made no attempt to articulate his reasons systematically, they were drawn from him during the hearing.

As the majority indicates, one of those reasons appears to have been his belief that McDonald was barred from a Young Adult Offender statute sentence by section 6 of Public Law 85–752.[8] That law prohibits such sentencing where the offender has been convicted of violating a law applicable "exclusively to the District of Columbia." McDonald's robbery conviction was based on a provision of the D.C.Code. Defense counsel argued that the robbery statute was nevertheless not a law applicable "exclusively to the District of Columbia." Without formally ruling on the matter, the trial judge made it quite clear that he rejected this argument, and he later invited counsel to submit legal authority, if any could be located. Nothing was submitted.

On this appeal the Government contends that there are two statutory grounds that prohibit a Young Adult Offender sentence. The first is that McDonald's conviction for robbery brings him within the terms of an uncodified statute that denies Young Adult Offender status to individuals convicted of crimes for which a "mandatory penalty" is provided.[9] The second is that violators of laws of the United States "applicable exclusively to the District of Columbia" are precluded from consideration for a Young Adult Offender sentence by the statute discussed by McDonald's attorney at sentencing.[10]

The majority considers only the latter, finds it applicable and valid, and affirms. I would hold that the first is inapplicable and that the second is unconstitutional. My reasons follow.

II

The first alleged bar is section 7 of Public Law 85–752, which states:

> This Act does not apply to any offense for which there is provided a mandatory penalty.[11]

The Government argues that McDonald's conviction for robbery is such an offense. The robbery statute, 22 D.C.Code § 2901 (Supp. V, 1972), provides a sentence of "imprisonment for not less than two years nor more than fifteen years."[12]

Section 7 was added on the floor of the House of Representatives by amendment,[13] and thus was not the subject of hearings or discussion in committee reports.[14] The floor debates clearly indicate, however, that it was not intended to apply to McDonald's conviction.

When House Joint Resolution 424, which became Public Law 85–752, was reported in the House, it was immediately attacked. The responsible committee had failed to consult with two federal agencies that objected to the Resolution: the Post Office Department and the Bu-

---

a dangerous weapon, and carrying a pistol without a license. His conviction was affirmed by separate order. McDonald received two additional sentences to be served concurrently with the robbery sentence set forth in the text. *See* Majority Opinion at 514.

8. Act of August 25, 1958, Pub.L. No. 85–752, § 6, 72 Stat. 847.

9. *Id.* § 7, 72 Stat. 847.

10. *Id.* § 6, 72 Stat. 847.

11. *Id.* § 7, 72 Stat. 847.

12. Whoever by force or violence . . ., shall take from the person . . . . of another anything of value, is guilty of robbery, and any person convicted thereof shall suffer imprisonment for not less than two years nor more than fifteen years.
22 D.C.Code § 2901 (1967).

13. *See* 104 Cong.Rec. 13,391–98 (1958).

14. *Id.* For the results, *compare, e. g.,* United States v. Hardaway, 350 F.2d 1021 (6th Cir. 1965) (parole unavailable after mail robbery conviction) *with* Jones v. United States, 419 F.2d 593 (8th Cir. 1969) (parole available after *armed* mail robbery conviction).

reau of Narcotics of the Treasury Department.[15] Their objections arose from the potential effect of the Young Adult Offender statute and the indeterminate sentencing statute [16] on two particular criminal penalties: one provided by the federal mail robbery statute, and the other set forth in 26 U.S.C. § 7237(d) (1970), which stiffens the punishment to be imposed for violations of certain narcotics laws.[17] The former provided that an armed or second offender "shall be imprisoned twenty-five years." [18] The latter specified that, as to the covered offenses, "the imposition or execution of sentence shall not be suspended, probation shall not be granted and in the case of a violation of a law relating to narcotic drugs, [the parole provisions of the U.S.Code and the D.C. Code] shall not apply." [19] Section 7, a prepared response to these criticisms, was offered and accepted at that time, and the Resolution was passed.

Although the ineligibility for probation and parole of second or armed violators of the mail robbery statute has been called into question since section 7 was enacted,[20] these events on the floor of the House clearly show that Congress intended to bar Young Adult Offender consideration only when the conviction was based on a statute that provided a mandatory minimum period of *actual incarceration*. In those cases in which the sentencing judge is given discretion to grant probation, suspend sentence, or provide some other form of supervision and rehabilitation—as opposed to a "mandatory penalty"—section 7 does not apply. This interpretation is, to me, compelling, for any other construction would lead to an irrational result. The sentencing judge would be forced to choose between immediate probation and a long prison term.[21]

A conviction for robbery, 22 D.C.Code § 2901 (1967), does not bar either probation or eligibility for immediate parole in the District of Columbia.[22] Thus, section 7 stands as no bar to consideration for a sentence under the Young Adult Offender statute in McDonald's case.

15. 104 Cong.Rec. 13,394 (1958).

16. 18 U.S.C. § 4208 (1970). This statute authorizes the sentencing judge to reduce, to less than the statutory one-third-of-minimum, the period of incarceration that must precede the offender's initial eligibility for parole.

17. These offenses include, *inter alia*, repeat offenses and sales to minors. *See* 26 U.S.C. § 7237(a), (b), (d)(2) (1970).

18. The statute also provides that an unarmed first offender "shall . . . be imprisoned not more than ten years." 18 U.S.C. § 2114 (1970). This provision could not have been the point of the objection, however, because it sets no minimum of any kind.

19. 26 U.S.C. § 7237 (1970). The specific parole provisions covered are 18 U.S.C. § 4202 (1970) and 24 D.C.Code § 201, later repealed and replaced by 24 D.C. Code §§ 201a–201c (1967).

20. *See* Smith v. United States, 284 F.2d 789 (5th Cir. 1960) ; Jones v. United States, 419 F.2d 593 (8th Cir. 1969)

(holding that even a 25 year sentence under 18 U.S.C. § 2114 (1970) does not constitute a "mandatory penalty" within the meaning of § 7).

21. The dilemma is clearly drawn by section 7's applicability to both the indeterminate sentencing statute, 18 U.S.C. § 4208 (1970), and the Young Adult Offender statute, 18 U.S.C. § 4209 (1970). Prohibiting both, yet allowing probation or suspension of sentence, would place the judge squarely between the devil and the deep, blue sea.

22. The probation statute, 16 D.C.Code § 710 (1967), is general by its own terms, providing that in "criminal cases" the court may suspend sentence or execution of sentence and place the defendant on probation. *See* United States v. Leach, 218 F.Supp. 271 (D.D.C.1963), remanded on other grounds, 118 U.S.App.D.C. 197, 334 F.2d 945 (1964).

As for immediate parole, 24 D.C.Code § 203 (1967) excepts from its indeterminate sentencing provisions certain severe offenses, including armed robbery. But it does not except simple robbery.

### III

The alternative alleged bar is section 6 of the same law, Public Law 85–752, which states:

> Sections 3 and 4 of this Act [the latter being the Young Adult Offender statute] shall apply in the States of the United States, and in the District of Columbia so far as they relate to persons charged with or convicted of offenses under any law of the United States *not applicable exclusively to the District of Columbia*.[23]

In contrast to the provisions of section 7 discussed above it is clear that section 6 was intended to cover the offenses of which McDonald was convicted.[24]

On its face, however, section 6 discriminates against those who violate laws "applicable exclusively to the District of Columbia." In United States v. Thompson,[25] this court held that whenever Congress passes a statute of general applicability that purports to single out and discriminate against residents of the District of Columbia, this court must strictly and carefully scrutinize that legislation. Indeed, the court held that, where the interests infringed by that law are of sufficient importance, this discrimination cannot stand unless it is supported by convincing reasons.[26]

The classification here is admittedly different, as the majority is at pains to point out.[27] The statute does not dis-

---

23. Act of August 25, 1958, Pub.L. No. 85–752, § 6, 72 Stat. 847 (emphasis added).

24. Counsel for appellant has argued that robbery is not an offense applicable exclusively to the District of Columbia. He notes that some local statutes include explicit language establishing this jurisdictional limitation, but 22 D.C.Code § 2901 (1967) does not.

 But the mere appearance of that law in the District of Columbia Code is sufficient to establish prima facie that the law is "applicable exclusively to the District of Columbia," and we have been cited to nothing that suggests otherwise.

 On March 3, 1901, Congress enacted a "code of law for the District of Columbia." Ch. 854, 31 Stat. 1189. Since that time, Congress has customarily indicated its intent to limit the applicability of laws to the District of Columbia by enacting them as amendments to the District of Columbia Code.

 In 1947 the precise import of such action, see 1 U.S.C. § 204(c) (1970), was defined. Inclusion "establish[es] prima facie the laws, general and permanent in their nature, relating to or in force in the District of Columbia . . ., except such laws as are of application in the District of Columbia by reason of being laws of the United States general and permanent in their nature." 1 U.S.C. § 204(b) (1970).

25. 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), cert. denied, 405 U.S. 988, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

 Contrary to the majority's contention, *see* Majority Opinion at note 12, *Thompson* did not approve a discrimination between local and national offenders. It explicitly pointed out that the petitioner did not argue that point. And to say that *Thompson* approved such a distinction solely on the basis of the different criminal codes involved is to compound the error. *See id.*

26. 452 F.2d at 1341.

27. I also agree with the majority's point that the discrimination runs only against *offenders*, and that residents of the District have as much interest in removal of local offenders from society as do the residents of the 50 states. *See* Majority Opinion at note 11.

 But their comment about the interests of local residents in the removal of offenders from society for "a definite term of years" is relevant to section 7, not section 6. And section 7 renders this argument irrelevant, for all such offenders are ineligible for Young Adult Offender status.

 Moreover, the majority's sympathy for District residents is unnecessary since the choice is not whether to remove offenders from society, but whether to treat and rehabilitate them after they have been so removed.

 Finally, the analogy is itself defective. We do not know whether the local/national distinction in the states is either rationale or justifiable, for the Constitution provides no mechanism for challenging that discrimination. There is such a mechanism in the District of Columbia, and it applies to discrimination between *offenders* with just as much force as it would to discrimination between *residents*.

criminate against those in the District of Columbia convicted of violating the national law, but against those convicted of violating laws exclusively local in application. But that distinction neither immunizes the discrimination before us from judicial scrutiny for compliance with the Constitution;[28] nor does it provide justification sufficient to sustain it.

## A. The Application of the Fifth Amendment

Congress is empowered under the Constitution "[t]o exercise exclusive Legislation in all Cases whatsoever," over the District of Columbia.[29] It is also empowered to enact "all Laws which shall be necessary and proper for carrying into Execution" all powers granted it under the Constitution.[30] When it exercises these powers, however, Congress acts subject to the due process clause of the Fifth Amendment, including its implicit guarantee of equal protection of the laws. See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Washington v. Legrant, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968) (consolidated with, and reported sub nom., Shapiro v. Thompson).[31]

The majority at several points suggests a contrary view by comparing the District of Columbia with "the other states." This view conceives of Congress as two distinct legislative bodies, one exercising the police power of a sovereign state over the District of Colum-

bia, and the other the limited power of the federal government. As between a state and the United States, of course, there is no guarantee of the equal protection of the laws. Thus, the classification imposed by section 6 would not have to comply with the requirements of equal protection. But the District of Columbia is not a state.

The majority also suggests that application of the Constitution to nullify section 6 would also "nullify every enactment dealing with purely local D.C. offenses which is at variance with its national federal counterpart."[32] On the contrary, I do not doubt that in exercising its power over the District of Columbia Congress may enact a separate body of legislation and apply it only within that jurisdiction.[33] Indeed, in enacting a separate body of law for the District Congress apparently also has the power to enact laws substantially identical to its national legislation, to provide differing penalties for their violation despite that identity, and to require that both sets of laws be enforced in the District of Columbia.[34] The question in this case, however, is *whether Congress can go further and establish such distinctions arbitrarily or even for impermissible purposes.*

The Constitution contains no provision specially immunizing from fifth amendment scrutiny discrimination against interests unique to the District of Columbia. Nor have the courts imported such

---

28. In *Thompson*, the court observed:
 One of the rights which the Constitution guarantees District residents, in common with all residents of the United States, is the right not to be arbitrarily singled out for special treatment not accorded to others similarly situated.
 *Id.* 452 F.2d at 1338. See Stoutenburgh v. Hennick, 129 U.S. 141, 9 S.Ct. 256, 32 L.Ed. 637 (1889).

29. U.S.Const., art. I, § 8, cl. 17.

30. *Id.*, cl. 18.

31. *See also* Schneider v. Rusk, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964).

32. *See* Majority Opinion at 518.

33. *See* O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933); *cf.* Stoutenburgh v. Hennick, 129 U.S. 141, 147, 9 S.Ct. 256, 32 L.Ed. 637 (1889).

34. *See* O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933); *cf.* Hutcherson v. United States, 120 U.S.App.D.C. 274, 345 F.2d 964, 967 (1965).
 This issue differs both from the question of federal preemption of state legislation and from the question of congressional delegation of legislative power to the District of Columbia government. *See* Maryland & District of Columbia Rifle & Pistol Ass'n v. Washington, 142 U.S.App. D.C. 375, 442 F.2d 123 (1971).

an immunity into the fundamental law.[35] Rather, the local power is merely one of a number of powers conferred on the Congress, and immunity from equal protection scrutiny by the judiciary must stand or fall on a general proposition: that Congress, by relying upon two constitutional grants of power rather than one, may discriminate free of the equal protection requirements of due process.

There is a simple answer to this proposition. Such a license to discriminate has never existed. Nor is it needed. The Government's purposes for enacting any particular statute are fully and adequately protected by the equal protection test. When those purposes justify a discriminatory impact on the rights of a class of individuals, then that statute will be sustained.

Moreover, there is every reason to disapprove such a claim of immunity. The power of Congress has grown in proportion to our national needs, and today is so broad that many—if not most—laws could be justified under several of the powers granted by the Constitution.[36]

If that overlap could immunize legislation from the requirements of due process and equal protection, an important part of the Fifth Amendment would, for all practical purposes, cease to exist.

Under the traditional and proper analysis, we look to the power that the Constitution confers on Congress; we do so only to determine (1) whether Congress could pass the law that is before us, and, if so, (2) for the furtherance of what purposes.[37] But when we apply the equal protection test, the interests of the Government in achieving the permissible purposes in question must be weighed against the impact on those whose interests are affected.[38]

### B. *The Requirements of Equal Protection*

The equal protection requirements of the Constitution cannot be expressed in a single standard, nor even in two. It is quite true that only when legislation burdens fundamental interests or creates suspect classifications do we require that the Government support that law

---

35. As a matter of fact, fifth amendment equal protection has been invoked to nullify discrimination that appeared to run against national interests, when that discrimination was accomplished through local District of Columbia statutes—the mirror image of the case before us:

> [A] construction which obviously results in oppressive discrimination against national banks would render the two sections unconstitutional, for it denies to national banks the due process guaranteed by the Fifth Amendment and the equal protection of the laws implied therein for the benefit of the inhabitants of the District of Columbia.

Hamilton Nat'l Bank v. District of Columbia, 85 U.S.App.D.C. 109, 176 F.2d 624, 629 (D.C.Cir. 1949).

And the Supreme Court has stated that the District cannot be viewed in isolation from Congress' national powers:

> If, before the District was set off, Congress had passed an unconstitutional act affecting its inhabitants it would have been void. If done after the District was created, it would have been equally void; *in other words Congress could not do indirectly, by carving out the District, what it could not do directly. The*

District still remained a part of the United States protected by the Constitution.

Downes v. Bidwell, 182 U.S. 244, 261, 21 S.Ct. 770, 777, 45 L.Ed. 1088 (1901) (Brown, J., announcing the judgment of the court and an opinion), *quoted and followed in* O'Donoghue v. United States, 289 U.S. 516, 540–541, 53 S.Ct. 740, 747, 77 L.Ed. 1356 (1933). *See also* Callan v. Wilson, 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223 (1888).

36. An examination of the legislative history of any of the civil rights statutes of the 1960's will demonstrate Congress' acute consciousness of this power.

37. *See* McCulloch v. Maryland, 4 Wheat. 316, 420, 4 L.Ed. 579 (1819):

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

38. *See, e. g.,* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Developments—Equal Protection, 82 Harv.L.Rev. 1065 (1969).

with compelling justifications.[39] But even in the absence of these special situations, the time has long passed when it could be flatly asserted that the Supreme Court will sustain legislative discriminations if "some rational basis" can be conceived for that action.[40] To determine the appropriate standard to apply to section 6, we must define the nature of the interests it burdens and the discrimination it establishes.[41]

That section 6 of Public Law 85–752 has an adverse impact on those whom it excludes from eligibility for a sentence under the terms of the Youth Corrections Act is obvious. The Young Adult Offender statute provides that eligibility for such a sentence is contingent on a finding that the individual will "benefit" from the program.[42] The benefits provided by statute include a guarantee of "treatment," which may include being sent to "training schools, hospitals, farms, forestry and other camps."[43] Those benefits include, as well, segregation from older and more hardened offenders whose presence would pose both a threat to the youth's rehabilitation and treatment and a grave source of physical danger.[44] Finally, and far from least important, those benefits include the possibility of having the original conviction set aside and re-entering the world with a clean record[45]—a benefit recognized by the Supreme Court as important enough to warrant, without more, habeas corpus relief when a conviction is found erroneous.[46]

Neither can it be doubted that the classification established by section 6 is problematic. It is not based on the nature of the particular offense committed, but on the jurisdictional scope of the law defining that offense. Further, the group it purports to exclude from eligibility for Youth Corrections Act sentencing is drawn exclusively from the District of Columbia, the residents of which, this court has pointed out, are entirely deprived of a voice in the Congress that enacts all local legislation.[47]

Given these effects of section 6, several decisional sources provide guidance in determining the nature of the justi-

---

39. *See* Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) ; Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L. Ed.2d 169 (1966).

40. *See* Comment, Legislative Purpose, Rationality, & Equal Protection, 82 Yale L. J. 123 (1972) ; Developments—Equal Protection, 82 Harv.L.Rev. 1065, 1077–87 (1969). *See also* Dandridge v. Williams, 397 U.S. 471, 508, 90 S.Ct. 1153, 25 L. Ed.2d 491 (Marshall, J., dissenting) ; Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (White, J., concurring).

This is not a case in which randomness is necessary or even permissible. *See* text accompanying note 76 *infra*. Similarly, we are faced with no open-ended program in which it is not appropriate to examine the means Congress chose because we cannot define the goals. *See* Ely, Legislative & Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1235–48 (1970).

41. The United States Attorney argues that even if the Fifth Amendment requires that we scrutinize the means Congress chose for applying the Young Adult Offender statute, it is improper to apply that scru-

tiny to the two classes of offenders established by § 6. The proper class, he says, is the group of individuals who violate a single criminal statute, such as robbery.

This is wide of the mark. Equal protection is afforded by Congress only if *each* classification satisfies constitutional minimums.

42. 18 U.S.C. § 4209 (1970).

43. *Id.* § 5011.

44. *See* text accompanying note 53 *infra*; Tatum v. United States, 114 U.S.App. D.C. 49, 310 F.2d 854 (1962) ; United States v. Bland, 153 U.S.App.D.C. 254, 276–277, 472 F.2d 1329, 1351–1352 (1973) (Statement of Circuit Judge Wright as to Why He Voted to Grant Rehearing *En Banc*).

45. 18 U.S.C. § 5017 (1970).

46. *See* Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) ; Tatum v. United States, 114 U.S.App.D. C. 49, 310 F.2d 854 (1962).

47. *See* United States v. Thompson, 147 U. S.App.D.C. 1, 452 F.2d 1333, 1341, (1971), cert. denied, 405 U.S. 998, 92 S. Ct. 1251, 31 L.Ed.2d 467 (1972).

fication that would be required to support that law. In United States v. Thompson [48] this court held that when a statute (1) infringes on the interests of an individual in securing his freedom on bail pending appeal from a criminal conviction, and (2) does so by separately classifying violators of a single criminal law on the basis of whether they were convicted in the District of Columbia or elsewhere, that statute can stand only if "convincing" reasons can be provided to support it. Reasons that are "merely rational or even plausible" will not suffice.[49]

Even when the nature of the legislative classification and the interests infringed are less striking, however, the Supreme Court has determined that merely conceivable justifications will not be found adequate. In Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), for example, the Court struck down a law limiting eligibility for local appointive office to freeholders. Without finding either that the law imposed a suspect classification or that it burdened fundamental rights, the Court refused to accept as a justification for the law anything less than a showing that a citizen "must . . . own real property if he is to participate responsibly," or that lack of ownership would establish "a lack of attachment to the community and its educational values." [50] This is a far more stringent requirement that a showing that property ownership has some rational relationship to community attachment and responsible participation.

Turner provides a convenient point of reference for an examination of section 6. Certainly, the interests at stake in

Turner—eligibility to hold appointive office—are no more important to an individual than the interests at stake in McDonald's situation—the opportunity to receive rehabilitative treatment, expungement of the criminal conviction, and segregation from the more hardened elements of society who inhabit the adult prisons. Similarly, a classification that discriminates against individuals in the voteless District of Columbia on the basis of the jurisdictional scope of a statute must be viewed with at least as much suspicion as a "freeholder" requirement in a State.

How far beyond Turner, and similar opinions of the Supreme Court,[51] we would have to go to take adequate account of the interests and classifications established by section 6, I need not determine. Both the terms and the legislative history of section 6, of the Young Adult Offender statute, and of the Youth Corrections Act, demonstrate that Congress lacked the quantum of justification that Turner demanded for the imposition of the Georgia "freeholder" requirement.

### C. The Legislative Scheme and Purposes

The Young Adult Offender statute [52] does not establish an independent correctional program. It merely extends the Youth Corrections Act to a limited number of individuals. Accordingly we must examine the scope and purpose of that Act, which was enacted in 1950 [53] because, as the Senate report stated:

By herding youth with maturity, the novice with the sophisticate, the impressionable with the hardened, and by subjecting youth offenders to the

48. Id.

49. Id. at 1341.

50. 396 U.S. at 364, 90 S.Ct. at 542. The Court went on to say:

However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that such equality is necessarily wanting in all citizens of the county whose estates are less than freehold.

51. See e. g., Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Comment, Legislative Purpose, Rationality & Equal Protection, 82 Yale L.J. 123 (1972).

52. See note 6 and accompanying text supra.

53. Act of September 30, 1950, Pub.L. No. 865, ch. 1115, § 2, 64 Stat. 1086.

evil influences of criminal techniques, without the inhibitions that come from normal contacts and counteracting prophylaxis, many of our penal institutions actively spread the infection of crime and foster, rather than check, it.[54]

Drawing its approach from the successful Borstal plan in England,[55] the Youth Correction Act provided new sentencing alternatives to the trial judge for committing the "youth offender," defined as a "person under the age of twenty-two years at the time of conviction."[56] The essential elements of that alternative program included indeterminate commitment at age-segregated facilities for the purpose of treatment, a supervised period of conditional release of at least one year, and a final year of unsupervised release.[57] Upon completion of this program in less than the maximum period authorized by law, the youth offender was to have his conviction automatically set aside and receive a certificate to that effect.[58]

As originally enacted, the Youth Corrections Act extended to "the continental United States other than the District of Columbia and Alaska."[59] The relevant committee reports,[60] which do not discuss this limitation, set forth only one criterion for limiting the Act—age. Indeed, the discussion of the age limitation seemed implicitly to reject the geographical limitation:

> Most of the causes which contribute to antisocial conduct of youth offenders in the period between adolescence and maturity disappear when the youth reaches full maturity. The problem is to provide a successful method and means for treatment of young men between the ages of 16 and 22 *who stand convicted in our federal courts* and are not fit subjects for supervised probation—a method and means that will effect rehabilitation and restore normality, rather than develop recidivists.[61]

Some *post hoc* explanation for the geographical limitation did come in 1952, when Congress extended the Youth Corrections Act to the District of Columbia, subject to the District's financial ability to contract for those services.[62] The House report stated:

> As stated by [Chief] Judge Laws [of the District Court for the District of Columbia] the former objections to include the District of Columbia under the provisions of the Youth Corrections Act may be summarized as follows: (1) a serious budgetary prob-

---

54. S.Rep. No. 1180, 81st Cong., 2d Sess. (1958).

55. *Id.*

56. 18 U.S.C. § 5006(e) (1970).

57. 18 U.S.C. §§ 5010, 5017 (1970). The Act establishes a graded series of four sentencing alternatives: probation, an indeterminate sentence of not more than 6 years under the terms specified in the Act; a similar indeterminate sentence with a judge-set maximum over 6 years but not over the maximum for the offense; and any other applicable penalty provision. The judge's discretion is limited in a way that makes the more lenient sentences the preferred alternatives. *See* United States v. Waters, 141 U.S.App. D.C. 289, 437 F.2d 722 (1970).

58. 18 U.S.C. § 5021 (1970).

59. Act of September 30, 1950, Pub.L. No. 865, ch. 1115, § 2, 64 Stat. 1089 (adding § 5024 to title 18, United States Code).

60. S.Rep. No. 1180, 81st Cong., 2d Sess. (1950); H.R. Rep. No. 2979, 81st Cong., 2d Sess. (1950); U.S.Code Cong.Serv., p. 3983.

61. S. Rep. No. 1180, 81st Cong., 2d Sess. (1950) (emphasis added).

62. Act of April 8, 1952, Pub.L. No. 300, ch. 163, 66 Stat. 45 (adding §§ 5025, 5026, and amending § 5024, of title 18, United States Code).
 "The views of a subsequent Congress of course provide no controlling basis from which to infer the purposes of an earlier Congress," Haynes v. United States, 390 U.S. 85, 88 n. 4 (1968), but they certainly indicate that Congress perceived no additional distinctions at the time of the 1952 extension of the Act.

lem would arise; (2) the method of sentencing convicted persons in the District of Columbia is different from that used in other district courts; (3) the District of Columbia has a separate Parole Board.[63] U.S.Code Cong. & Admin.News p. 1380.

After pointing out that the 1952 amendment adequately solved objections (2) and (3), the report concluded that the remaining objection (1) was "budgetary." [64] Congress, of course, solved that by adopting the amendment and appropriating funds. Alaska and Hawaii were brought within the Act as they became states [65] and, in 1967, the financial limitation on application of the Act to the District of Columbia was removed without further explanation.[66]

Originally enacted in 1958,[67] the Young Adult Offender statute conditionally extended the operation of the Youth Corrections Act to individuals who have reached their twenty-second birthdays but not their twenty-sixth birthdays. Like the Youth Corrections Act, it excepted from coverage Alaska and the District of Columbia.[68] Like the Youth Corrections Act, it was amended to include Alaska and Hawaii as they became states.[69] *Unlike* the Youth Corrections Act, however, the Young Adult Offender

statute has not been amended to cover D.C.Code offenses.

The separate processes of enactment and amendment of these two statutes resulted in this anomalous scheme: any individual under the age of twenty-six who is convicted of violating a congressionally created crime is eligible for Youth Corrections Act sentencing *unless* that conviction came after his twenty-second birthday and was based on a law "applicable exclusively to the District of Columbia."

Yet when Congress set up the Youth Corrections system, and when it amended the provisions establishing eligibility for that program, Congress did not consider whether there were any relevant differences between national and local offenses, or between the kinds of individuals who had violated those laws. In fact, although Congress did not discuss its reasons for limiting the Young Adult Offender statute, it did explicitly state that its sole reason in 1952 for not having earlier extended the Youth Corrections Act to the District of Columbia was the program's financial cost. Even if cost could justify a less ambitious program, it could not justify arbitrarily excluding one group on the basis of a

63. H.R. Rep. No. 1629, 82d Cong., 2d Sess. 3 (1952).

64. *Id.* 4.

65. Act of June 25, 1959, Pub.L. No. 86–70, § 17(a), 73 Stat. 144 (changing "other than Alaska" to "including Alaska"). *See* S.Rep. No. 331, 86th Cong., 1st Sess. 37 (1959) (implying that the drafters were unaware they were amending the Young Adult Offender statute); Act of July 12, 1960, Pub.L. No. 86–624, § 13(b), 74 Stat. 413 (applying the Act to "States" generally).

66. Act of December 26, 1967, tit. VIII, § 801, 81 Stat. 741.

The committee reports do not explain the reasons for the extension, but merely note that the amendment removes "the distinction between youth offenders convicted in the District of Federal violations not exclusively local and those convicted

of violations of exclusively local law." H. R. Rep. No. 387, 90th Cong., 1st Sess. 39 (1967). *See* S.Rep. No. 912, 90th Cong., 1st Sess. 25, 31 (1967).

Both reports use strong language to deplore the rise of crime in the District of Columbia. In the face of that rise, the further solidification of Youth Corrections Act coverage of local offenders is significant. Congress did not view the local crime problem as a reason for distinguishing between D.C. Code offenders and U.S. Code offenders for purposes of Youth Corrections Act sentencing.

67. Act of August 25, 1958, Pub.L. No. 85–752, § 4, 72 Stat. 846.

68. *Id.*

69. Act of June 26, 1959, Pub.L. No. 86–70, § 17(b), 73 Stat. 144; Act of July 12, 1960, Pub.L. No. 86–624, § 13(c), 74 Stat. 413.

classification unrelated to the purposes of the program.[70]

Thus, there is no justification for section 6's exclusionary language in the statutes and legislative history. Nor has the United States Attorney offered any of his own. He suggests, however, and a majority of the panel agrees, that the Young Adult Offender statute can be approved as an experiment in corrections. Noting that in United States v. Thompson,[71] this court condemned experimentation that directly burdened the interests of District of Columbia residents, the majority attempts to stand this ruling on its head. They assert that Congress in section 6 chose to experiment by providing all individuals except local District of Columbia offenders with the "benefit" of Youth Corrections Act sentences. This is a play on words, for the discrimination runs against the local offender in either case.

Although legislative experiments are not always to be condemned, despite the obvious fact that they impose inequalities because of their limited coverage, there must be limits to the degree of inequality introduced and the arbitrariness with which individuals are included or excluded from the statute's coverage. In view of the discrimination imposed here, and the importance of the alternative treatment provided by Youth Corrections Act sentencing, section 6 draws too crude an exclusionary line to warrant judicial approval.

Although the United States Attorney has provided no other arguments in support of the statute, the majority has focused on the most obvious. It states that Congress might have reasonably found that individuals become less fit for Youth Corrections Act treatment as they age. While I find no difficulty with that general proposition, I cannot conceive of reasons that would suggest that this phenomenon is uniquely a characteristic of those who violate the District of Columbia's laws. Nor has any evidence of such a phenomenon been brought to our attention. But, by extending Youth Corrections Act treatment to all violators until the age of twenty-two, and to violators of the national law until the age of twenty-six, Congress has clearly legislated out of existence any explanation other than that local law violators are unique in the speed with which they become incorrigible.[72]

To the extent that this phenomenon might be true in a particular case, or even for a particular law, Congress has taken full account of the possibility in the Young Adult Offender statute itself, by requiring the sentencing judge to take account of the offender's "delinquency or criminal experience, his social background, capabilities, mental and physical health, and such other factors as may be considered pertinent."[73] If, after considering all of these, the judge "finds that there [are] reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act, sentence may be imposed" under that law.[74]

To exclude individuals who would otherwise qualify for Youth Corrections Act treatment simply because they violated local rather than national law has no more basis in either facts, common

---

70. *See* Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The Court rejected a probate rule establishing a preference for male executors. Idaho attempted to justify the statute as a mechanism for avoiding the need to settle disputes. The Court held that a statute accomplishing this purpose, yet having an "arbitrary" relationship to the ultimate purpose of providing executors, cannot stand under the rational relation test of equal protection. *See* note 51 *supra*.

71. 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), cert. denied, 405 U.S. 988, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

72. Indeed, Congress' amendment of the Youth Corrections Act in 1967 in the face of a rising crime rate tends further to suggest that prior to age 22, no difference between offenders of local and national law was perceived. *See* note 66 *supra*.

73. 18 U.S.C. § 4209 (1970).

74. *Id.*

sense, or morality, than the rejected argument in Turner v. Fouche [75] that property ownership enhanced the likelihood that an individual would participate responsibly in the affairs of his community. And the majority's analogy to the states is entirely inapposite, since there is no guarantee of equal protection between national offenders and local offenders in the states.

Thus, the majority is approving section 6 on the ground that it needs no rational basis. Where randomness is a virtue, this is entirely proper—as, for example, in cases of jury selection and Selective Service eligibility.[76] But this is not such a case. This program has clearly defined objectives, and eligibility criteria must rationally correspond to those goals.

Even if arbitrary exclusion were proper where Youth Corrections Act sentencing is concerned, I would not permit exclusion of District of Columbia offenders unless some rationale appeared. Even when arbitrariness is permissible, Congressional motivation must be free of unconstitutional taint.[77] And the impact of a particular law may in some cases be so clear and predictable that it requires inferences concerning legislative motivation. See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110 (1960).

Every enactment disadvantaging District of Columbia residents occurs against a unique, albeit unavoidable,

background. First, the population of the District is almost three-quarters Black,[78] and racial minorities compose approximately ninety-five percent of those arrested for major violations in the District.[79] Congress must be aware of these facts, if not their impact on legislation. Second, Congress is not accountable to the population of the District of Columbia. Where electoral accountability is absent, normal presumptions of legislative regularity have a weaker claim. See United States v. Carolene Products Co., 304 U.S. 144, 58 S. Ct. 778, 82 L.Ed. 1234 (1938).

These are the facts of life in the District of Columbia. While they do not compel an inference that any particular discrimination is the product of an impermissible motive, they plainly signal such a pervasive potential for unconstitutional discrimination that some rational basis must be made to appear.

Whether Congress intended it or not, the painful truth is that section 6 imposes such a discrimination against District of Columbia offenders. And, if that is not enough, this is the same group of offenders about which we have said:

> Many of these juveniles have grown to an embittered adolescence amidst the frustration of the ghetto. They need, desperately, some reason to hope they are not the losers that society has labelled them. This also the Juvenile Court too often may not be able to provide.[80]

75. 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). *See* text accompanying notes 50–51 *supra*.

76. *See* Ely, Legislative & Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1230 (1970), and cases noted therein.

77. *See id.* 1281–84. This is not to say that legislation is to be struck down because of the presence of impermissible motive. Rather, as Professor Ely demonstrates, the presence of an impermissible motive may operate only to shift the burden to the Government to show that the law is rationally related to some permissible goal. But where the statutory exclusion is random or arbitrary, merely shifting the burden will generally result in voiding

the law, because the exclusion by definition lacks a rationale. *See id.* 1269–81.

78. To be precise, 71.0%. All other minorities account for 1.3% of the District's three-quarter million population. *See* United States Department of Commerce, General Population Characteristics: United States Summary, Pub. No. PC(1)–B1 (January 1972) at 323, 333.

79. Arrests of adults for serious offenses numbered 11,526 non-whites and 793 whites in fiscal 1971. Arrests of juveniles for serious offenses numbered 4080 non-whites and 72 whites. Metropolitan Police Department of Washington, D.C., Annual Report, Part II, at 34–57 (1972).

80. Haziel v. United States, 131 U.S.App. D.C. 298, 404 F.2d 1275, 1279–1280 (1968).

To withhold from them, as young adults, the *last* meagre hope for exposure to a program that promises—even if it may not deliver—rehabilitation and treatment, is to pour salt on their lifelong sores. That is the ugly heart of this case. I regret that the majority is unwilling to address it at all.

Fortunately, we need not impute any evil motive to Congress, for in the history of this patchwork legislation[81] it clearly appears that the infirmities of section 6 may be laid on inadvertence. Conceivably, section 6 might have stood judicial scrutiny when enacted. But when Congress extended the Youth Corrections Act to local offenders,[82] it rendered the distinction between local and national offenders meaningless. Thus, the appropriate remedy in this case is to strike down section 6 and abolish the distinction entirely for Youth Corrections Act sentences.

I thus conclude that neither section 6 nor section 7 bars McDonald from consideration for a Youth Corrections Act sentence.

[redacted]

81. The statutes that produced the discrepancy between the Youth Corrections Act and the Young Adult Offender statute were the Alaska and Hawaii amendments, *see* notes 64 and 68 *supra*, and the 1967 omnibus crime bill, *see* note 65 *supra*. These bills were housekeeping measures designed to accommodate concerns other than the scope of the sentencing statutes before us. *See* note 64 *supra*.

